UNITED STATES OF AMERICA                        CRIMINAL ACTION

VERSUS                                                      No. 09-157

JAMAL MARTIN WALTON                                 SECTION I

## ORDER AND REASONS

Before the Court is a motion[1] filed by defendant, Jamal Walton, to withdraw his guilty plea. The government has filed an opposition.[2] For the following reasons, the motion is **DENIED**.

### *BACKGROUND*

On June 10, 2004, Walton was arrested by the State in connection with a carjacking and murder that had occurred on June 9, 2004, in New Orleans, Louisiana. Walton was seventeen (17) years old at the time of his arrest. He has a history of developmental issues, particularly in the areas of speech, communication, language, and mental health. Following his arrest, Walton was found incompetent to proceed by the Orleans Parish Criminal District Court and he was remanded to the Feliciana Forensic Facility ("Feliciana") for competency restoration. After three months at Feliciana, his competency was restored and he entered a guilty plea to a reduced charge of simple robbery.

On May 29, 2009, Walton was indicted by a federal grand jury and charged with conspiracy to use and carry a firearm during a crime of violence, using and carrying a firearm during a crime of violence, carjacking, and use of a firearm during a carjacking resulting in the

[1] R. Doc. No. 397.

[2] R. Doc. No. 407.

death of another person.[3]  The charges stemmed from the same carjacking and murder to which he had previously pled guilty to a charge of simple robbery in state court.

On July 2, 2010, this Court ordered that an evaluation of Walton's competency be conducted by Dr. John W. Thompson of the Tulane University Department of Psychiatry & Neurology.[4]  On July 23, 2010, Dr. Thompson evaluated Walton and concluded that he can relate to his attorney with a reasonable degree of rational understanding.[5]  He also concluded that Walton has a rational understanding of the proceedings against him and that he does not have an active mental disease or defect that would impair his ability to understand the proceedings or to assist in his own defense.[6]  The Court held a competency hearing on August, 13, 2010, during which Dr. Thompson testified and presented his evaluation.[7]  The Court found that Walton was competent to proceed in connection with this matter.[8]

On December10, 2010, Carol Kolinchak of the Juvenile Justice Project enrolled in the case and was appointed to represent Walton in connection with the charges.[9]  Kolinchak claims that after reviewing the case file and meeting with Walton on several occasions, she became concerned about his ability to communicate and to make informed choices about his case.[10]

---

[3] R. Doc. No. 1.

[4] R. Doc. No. 91.

[5] Report of Dr. Thompson, p.9.

[6] *Id.*

[7] R. Doc. Nos. 104, 404.

[8] *Id.*

[9] R. Doc. No. 138.

[10] R. Doc. No. 397-1, p.3.

Kolinchak claims that she interviewed defendant's mother and that she was advised to "talk to Jamal as if you were talking to a ten year old."[11]

On July 15, 2010, Kolinchak alleges that her concerns about Walton's ability to communicate became heightened after meeting with the government in connection with plea negotiations.[12] Kolinchak claims that the government refused to make a sentencing recommendation and that Walton declined the government's offer to plead guilty.[13] Kolinchak asserts that when Walton made that decision, he was under the impression that it would be his final opportunity to accept a plea bargain.[14]

On September 7, 2011, Kolinchak filed an *ex parte* motion under seal seeking approval from this Court to retain Dr. Bauer as an expert in juvenile psychology and adolescent development.[15] Counsel explained Walton's troubled developmental history and explained that he has a documented history of communication impairments.[16] She stated that his letters to her were not written in his handwriting and that his family had advised her to explain things to him as if talking to a ten-year-old.[17] She stated to the Court that she needed Dr. Bauer's expert assistance "to understand Jamal's mental health and developmental history."[18] However, counsel

---

[11] *Id.* at p.3 & n.1.

[12] *Id.* at p.3

[13] *Id.*

[14] *Id.*

[15] R. Doc. No. 281.

[16] *Id.* at 2-3.

[17] *Id.* at 3.

[18] *Id.*

did not ground her request on the fact that she had trouble communicating with Walton.[19] Rather, she cited several cases for the proposition that "juveniles are different than adults and the law must take these differences into account when looking at culpability and punishment."[20] She concluded that she needed expert assistance in order to take those differences into account when preparing Walton's defense at trial.[21]

The Court denied counsel's request for Dr. Bauer's expert assistance on the same day it was filed.[22] The Court held that counsel had not sufficiently demonstrated why it was necessary to employ Dr. Bauer with only seven days remaining before the final pretrial conference.[23] The Court explained that counsel had not articulated with the requisite level of specificity "why, in this late hour, the ability to understand the differences between juveniles and adults is necessary in preparing a defense at trial."[24] The motion failed to state with any specificity the defense that counsel was contemplating and how Dr. Bauer's testimony would support the preparation of such a defense.[25] The Court reasoned that Walton had already been found competent to proceed and that he had not raised insanity as a defense.[26] Although the Court acknowledged that Walton's developmental history might be relevant to a sentencing decision, the Court found that

---

[19] *Id.* at 3-5.

[20] *Id.*

[21] *Id.* at 5.

[22] R. Doc. No. 284.

[23] *Id.* at 2-3.

[24] *Id.* at 2.

[25] *See id.* at 2-3.

[26] *Id.* at 2.

counsel had failed to show that Dr. Bauer's testimony would inform any determination at trial.[27] The Court also noted that Walton's motion may have been "premature as Dr. Bauer's services would not be necessary if Walton is found not guilty."[28]

On September 27, 2011, six days before Walton was scheduled to stand trial on the charges, the government contacted Kolinchak to discuss the possibility of Walton pleading guilty.[29] Kolinchak claims that the government offered to drop several counts of the superseding indictment and to make a non-binding recommendation of a twenty-five year sentence in exchange for Walton's full cooperation.[30] She claims that she visited Walton that afternoon and the following morning to discuss the government's offer.[31] Kolinchak states that each of the visits lasted several hours and that she "made every effort to communicate the complexities of a non-binding recommendation."[32] Because Walton decided to accept the plea bargain, counsel asserts that she prepared him for his rearraignment scheduled in two days, reviewed with him the factual basis and plea agreement, and prepared him for a debriefing with the government.[33]

On September 29, 2011, Walton pleaded guilty to counts one and three of the superseding indictment.[34] During the plea colloquy, Walton was slow to respond to the Court's questions

---

[27] *Id.* at 2-3.

[28] *Id.* at n.2.

[29] R. Doc. No. 397-1, p. 4.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] R. Doc. No. 326.

and the Court inquired into his ability to proceed with the rearraignment.[35]  Walton, Kolinchak,

and the government assured the Court that they had no question about his ability to proceed.[36]

---

[35]  THE COURT:  Hold on a second.  My clerk just issued an oath.  In other words, because – the answers that you give to the Court, I want to be under oath. Because, if you intentionally make a false statement to the Court, either orally or in writing, you can be charged with a federal crime.  Do you understand that?

       (witness nods head.)

THE COURT:  Speak up.

THE DEFENDANT:  Sir.

THE COURT:  Do you not want to plead guilty?

THE DEFENDANT:  I do want to plead guilty, sir.

THE COURT:  Is there any problem understanding what I'm saying to you right now?

THE DEFENDANT: No, sir.

THE COURT:  Is he on something?

MR. TOOMEY:  Judge, can we approach?

       (Sidebar conference.  Defendant not present.)

MS. COLINCHAK:  He just thinks for a minute before he responds.

THE COURT:  He sounds like he's on something.

MS. COLINCHAK:  I don't think he is.

MR. TOOMEY:  We've met with him once, Judge, and previously been with him before and listened to his jail calls.  This is how he normally communicates, in my experience.

MS. COLINCHAK:  Yeah.

THE COURT:  He seems lackadaisical, it seems, when you ask him a question.

MR. TOOMEY:  His inappropriate reactions to questions has been common throughout.

MS. COLINCHAK:  His family has said the same thing.

THE COURT:  Do you have any question about his ability to proceed[] today?

MS. COLINCHAK:  I don't.

THE COURT:  You don't.

MS. COLINCHAK:  No.

THE COURT:  Does it take him this long to respond to you?

Walton now contends, however, that while Kolinchak believed Walton was competent to enter a plea of guilty, she was without the expert assistance of Dr. Bauer, which she had previously requested, and she did not have the ability to "properly interpret and understand Jamal's behavior and adequately and effectively represent his best interests."[37]

On September 30, 2011, Walton and Kolinchak met with the government for what ultimately proved to be an unproductive encounter.[38]  Walton characterized the meeting as a debriefing following the rearraignment.[39]  He asserts that the combination of his communication impairments, his inability to understand a non-binding recommendation, his overwhelming

---

MS. COLINCHAK:  Yes.

THE COURT:  Because I know that I've read the record that I think that Dr. Thompson did in connection with the examination.  And, his IQ was low, but it wasn't in the retarded range or anything like this.

MS. COLINCHAK:  When he's nervous in particular, and speaking in public or in front of other people.  Maybe he's gotten better over time with me.

THE COURT:  Okay.  Let's see if he can get through this.  I'm not so sure.

R. Doc. No. 405, pp. 3-5.

[36] *See id*.  The Court specifically asked Walton's counsel whether she has had any difficulty communicating with her client during the following colloquy:

THE COURT:  Counsel, how often and frequently have you spoken to your client within the past 30 days or so?

MS. COLINCHAK:  I spoke to him this  morning.  I spoke to him yesterday.  I spoke to him the day before yesterday.  My colleague saw him earlier this week.  I saw him last week.  And then, prior to that, it was two weeks. So several times.

THE COURT:  Have you any difficulty communicating with him?

MS. COLINCHAK:  No, Your Honor.

THE COURT:  Do you have any doubt as to his competence to plead guilty?

MS. COLINCHAK:  No, I don't.

R. Doc. No. 405, pp. 7-8.

[37] R. Doc. No. 397-1, p.5 & n.2.

[38] *Id.* at p.5.

[39] *Id.*

emotions, and the inherent stress of the debriefing quickly frustrated him, and that he became unable to answer questions or to communicate with the government.[40]  As a result, he claims that the government concluded that it could not work with him.[41]  He now asserts that counsel was unable to understand him or explain his behavior to the government without the assistance of Dr. Bauer and that Kolinchak could not adequately and effectively represent his best interests at the debriefing.[42]

The government offers a different account of its discussions with Walton after he entered his guilty plea.[43]  The government asserts that the meeting was not a debriefing and that it met with Walton and Kolinchak for the purpose of ascertaining whether or not Walton was willing and able to testify against his co-defendant at trial the following Monday, October 3, 2011.[44] The government claims that Walton had no trouble understanding the substance of their discussions and that the meeting ended because he lied about the murder and downplayed his and Charles Raymond's roles in the crime.[45]

The government recalls that before the meeting ended, Kolinchak informed them that Walton wanted to speak with the government alone.[46]  The government claims that Walton candidly acknowledged that he had just lied about the murder and that he wanted to testify in

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] R. Doc. No. 407.

[44] *Id.* at 1-2.

[45] *Id.* at 2-3.

[46] *Id.* at 3.

order to avoid receiving a life sentence.[47]  The government states that it believed Walton could not be trusted as a government witness.[48]  As a result, the government argues that it ended the meeting without accepting his offer to testify due to Walton's attempt to pass off unreliable and self-serving information and not because Walton had difficulty understanding the complexities of a non-binding recommendation.[49]

The government also vigorously disputes that it ever agreed to make any recommendation of any sort as to Walton's sentence.[50]  The government contends that it "clearly stated that: 1) Jamal has the constitutional right to plead guilty; 2) should he do so, the government would provide him an opportunity to cooperate; and 3) should that cooperation be substantial, the government expressed a commitment to request a sentence reduction."[51]  The government notes that it also discussed with Kolinchak and Walton that his applicable advisory guideline range would likely be a sentence of thirty years to life imprisonment.[52]  However, the government contends that it never agreed to make any recommendation as to his sentence.[53]

On January 4, 2012, more than three months after he entered his guilty plea, Walton renewed his *ex parte* motion for expert assistance.[54]  The Court granted the motion and Dr. Bauer

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at 1-2.

[51] *Id.* at 2.

[52] *Id.*

[53] *Id.*

R. Doc. No. 405, pp. 31-33.

[54] R. Doc. No. 377.

evaluated Walton on January 16, 2012.[55]  Walton contends that the report "firmly establishe[s]

that even when Jamal was putting forth his best effort, his impairments prevented him from fully

comprehending complex, abstract concepts and communicating effectively."[56]  He now argues

that his plea was not knowing and voluntary because his counsel did not have the assistance of

Dr. Bauer to help her fully understand the extent of his impairments, his inability to comprehend

a non-binding recommendation as to sentencing, or his behavior during the rearraignment and

subsequent debriefing by the government.[57]

*LAW AND ANALYSIS*

Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure states that a defendant may

withdraw a guilty plea after the court has accepted the plea if "the defendant can show a fair and

just reason for requesting the withdrawal." The legal standards that govern this Court's

determination of defendant's motion to withdraw his plea are clearly set forth in *United States v.*

*Powell*, 354 F.3d 362, 370 (5th Cir. 2003):

> A district court's denial of a motion to withdraw a guilty plea is
> reviewed for abuse of discretion. *United States v. Lampaziane*,
> 251 F.3d 519, 523 (5th Cir. 2001) (citation omitted); *see also*
> *United States v. Mann*, 161 F.3d 840, 860 (5th Cir. 1998) ("[A]
> district court abuses its discretion if it bases its decision on an error
> of law or a clearly erroneous assessment of the evidence."). A
> defendant does not have an absolute right to withdraw [his] guilty
> plea. *United States v. Brewster*, 137 F.3d 853, 857 (5th Cir. 1998).
> However, a district court may, in its discretion, permit withdrawal
> before sentencing if the defendant can show a "fair and just
> reason." Id. (citing former Fed. R. Crim. P. 32(e), now located at
> Rule 11(d)(2)).

---

[55] R. Doc. Nos. 378, 380, 397-4.

[56] R. Doc. No. 397-1, p. 6.

[57] *Id*. at pp. 7-9

The defendant bears the burden of establishing a fair and just reason for withdrawing his plea. *Id.* at 858. This Circuit considers seven factors when deciding whether the defendant has met this standard: whether (1) the defendant asserted his innocence, (2) withdrawal would cause the government to suffer prejudice, (3) the defendant delayed in filing the motion, (4) withdrawal would substantially inconvenience the court, (5) close assistance of counsel was available, (6) the original plea was knowing and voluntary, and (7) withdrawal would waste judicial resources. *United States v. Carr*, 740 F.2d 339, 343-44 (5th Cir. 1984).The decision to permit or deny the motion is based on the totality of the circumstances. *Brewster*, 137 F.3d at 858 (citation omitted). A district court is not required to make findings as to each of the Carr factors. *Id.* (citing *United States v. Badger*, 925 F.2d 101, 104 (5th Cir. 1991)).

"Neither is any single factor dispositive." *United States v. Lampazianie*, 251 F.3d 519, 524 (5th Cir. 2001). "Although defendants are not entitled to an evidentiary hearing, a hearing is required 'when the defendant alleges sufficient facts which, if proven, would justify relief.' " *Powell*, 354 F.3d at 370 (quoting *United States v. Mergist*, 738 F.2d 645, 648 (5th Cir. 1984)).

## I. Assertion of Innocence

When a defendant claims innocence of a crime, that claim alone does not justify withdrawal of the guilty plea. *See United States v. Grant*, 117 F.3d 788, 789-90 (5th Cir. 1997) (noting that an assertion of innocence unsupported by specific facts is insufficient, standing alone, to justify allowing a defendant to withdraw a guilty plea); *United States v. Rojas*, 898 F.2d 40, 43 (5th Cir. 1990); *Carr*, 740 F.2d at 340. "Otherwise, the mere assertion of legal innocence would always be a sufficient condition for withdrawal, and withdrawal would effectively be an automatic right." *Carr*, 740 F.2d at 344. Conferring on a defendant an automatic right to withdraw a guilty plea which has been accepted by the Court would "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess." *United States v. Hyde*, 520 U.S. 670, 677, 117 S. Ct. 1630, 1634, 137 L. Ed. 2d 935 (1997). Moreover, "[i]t is

well established that '[s]olemn declarations in open court carry a strong presumption of verity." '
*Lampazianie*, 251 F.3d at 524.

During Walton's plea colloquy, the Court advised him that if he did not understand any question, he should ask the Court to explain it.[58]  In the course of that plea hearing, Walton affirmatively answered that, (1) he had read the indictment; (2) that he understood the crime charged in the indictment; (3) that he understood the elements of that crime as explained by this Court, and (4) that he understood the penalty to which he was subject as a result of pleading guilty to the crime charged in the indictment.[59]  The Assistant United States Attorney summarized the government's evidence in a factual basis that Walton signed.[60] Walton advised the Court that he understood the evidence and that he agreed that the evidence set forth in the factual basis was correct.[61] The Court repeatedly questioned Walton with respect to whether he understood the crime charged, the consequences of his plea, and whether he was pleading guilty because he was, in fact, guilty.[62]  In response to this Court's questions, Walton stated, under oath, that he was pleading guilty because he was, in fact, guilty.[63]  Walton has not asserted his innocence since he plead guilty to the charges and he has not asserted his innocence in connection with this motion.[64]

## II.  Timeliness of the Motion to Withdraw

---

[58] R. Doc. No. 405, p.6.

[59] *See generally id.*

[60] *Id.* at 33-36.

[61] *Id.* at 36-38.

[62] *Id.* at 38.

[63] *Id.*

[64] R. Doc. No. 397-1, p. 7, n.7 (" . . . Jamal does not and has not claimed innocence . . . ").

Walton waited nearly five months prior to giving any indication to this Court that he sought to withdraw his guilty plea. Walton entered his guilty plea on September 29, 2011.[65] As the government observes, it was not until 11:35 p.m. on February 23, 2012, only two business days before his scheduled sentencing on February 28, 2012, that this Court was first made aware of Walton's claim that his plea was not voluntary.[66]

"[T]he longer a defendant delays in filing a withdrawal motion, the more substantial reasons he must proffer in support of his motion." *Carr*, 740 F.2d at 344. Conversely, "a prompt withdrawal may indicate that a plea was unknowingly entered in haste." *Id.* "The rationale for allowing a defendant to withdraw a guilty plea is to permit him to undo a plea that was unknowingly made at the time it was entered. The purpose is not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *Id.* at 345.

Walton failed to take advantage of several opportunities to raise the concerns that he now claims render his guilty plea invalid. The Court denied Walton's first motion for expert assistance before trial for reasons previously stated herein.[67] At the rearraignment, just a few days later, the Court directly asked counsel, in open court, whether or not she had any difficulty communicating with Walton and/or had any doubts about his competency to plead guilty.[68] Counsel denied that she had any trouble communicating with Walton or concerns as to his

---

[65] R. Doc. No. 326.

[66] *See* R. Doc. No. 397.

[67] R. Doc. No. 284.

[68] R. Doc. No. 405, pp. 7-8.

competency.[69] Counsel then waited more than three months after the rearraignment to file a second motion for expert assistance.[70] Counsel represented to the Court in that motion that she needed Dr. Bauer's assistance for the purposes of sentencing and she failed to mention the need to inquire into the validity of Walton's guilty plea.[71] Finally, after obtaining Dr. Bauer's report, Walton waited another nineteen days—until what was virtually the last minute before sentencing—to file a motion to withdraw his guilty plea.[72] *See id.* at 345 (holding that waiting twenty-two days before filing a motion for withdrawal until just three days before sentencing was not prompt).[73]

Instead of demonstrating a "fair and just" reason for allowing a withdrawal, these facts strongly suggest a tactical decision as well as Walton's belief that he made a bad choice when he decided to plead guilty. Walton's argument that he would have no legal basis to file this motion before he received Dr. Bauer's expert report lacks credibility. Accordingly, the Court finds that defendant's delay favors denial of his motion to withdraw his guilty plea.

## III. Knowing and Voluntary Plea

In any criminal case, a competency determination must be made by a court "when a court has reason to doubt the defendant's competence." *Godinez v. Moran*, 509 U.S. 389, 402 n.13, 113 S. Ct. 2680, 2688 n.13, 125 L. Ed. 2d 321 (1993); *DeVille v. Whitley*, 21 F.3d 654, 656-57 (5th Cir. 1994). The legal standard governing a defendant's competency to enter a guilty plea is

---

[69] *Id.*

[70] *See* R. Doc. No. 377.

[71] *See id.* at 6-10.

[72] *See* R Doc. No. 397.

[73] The Court also notes that Walton received a copy of the final presentence investigation report, which provided for a guideline sentence of life imprisonment, on February 16, 2011, just seven days before filing the motion to withdraw his plea. R. Doc. No. 395.

identical to that which governs a defendant's competency to stand trial. *See Godinez*, 509 U.S. at 399, 113 S. Ct. at 2686; *DeVille*, 21 F.3d at 656. A defendant is competent to enter a guilty plea when "the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.' " *Godinez*, 509 U.S. at 396, 113 S. Ct. at 2685 (citing *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)); *DeVille*, 21 F.3d at 656.

After a court has determined that a defendant is competent to enter a guilty plea, the court must then satisfy itself that the defendant's decision to plead guilty is knowing and voluntary. *Godinez*, 509 U.S. at 400-401, 113 S. Ct. at 2687-88 (describing the "two-part inquiry" into competence and knowing and voluntary waiver of constitutional rights with respect to a guilty plea); *DeVille*, 21 F.3d at 657 (citation omitted). For a guilty plea to be knowing and intelligent, "the defendant must have 'a full understanding of what the plea connotes and of its consequence.' " *United States v. Hernandez*, 234 F.3d 252, 255 (5th Cir. 2000) (quoting *Boykin v. Alabama*, 395 U.S. 238, 244, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969)). The defendant must have notice of the nature of the charges against him, the defendant must understand the consequences of his plea, and he must understand the nature of the constitutional protections he is waiving. *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000). For a guilty plea to be "voluntary," it must "not be the product of 'actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant' or of state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel." *Id.* (quoting *Brady v. United States*, 397 U.S. 742, 750, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970)).

In this case, the Court held a competency hearing on August 13, 2010 and found that Walton was competent to proceed.[74]  During the rearraignment proceedings on September 29, 2011, Walton stated that he had not recently been under the care of a doctor and that he had not taken any narcotics, medicine, or pills within twenty-four hours of his guilty plea.[75]  Defense counsel and government counsel had no doubt that the defendant was competent to enter a plea of guilty.[76]  Based upon the representations made by the defendant, his counsel, and the government, this Court found that Walton was competent to plead guilty.[77]

Before accepting his plea of guilty, this Court painstakingly explained the elements of the crimes of conspiracy to use or carry a firearm during a crime of violence and carjacking.[78] The Court then explained that, upon a plea of guilty, Walton was subject to a maximum term of life imprisonment.[79]  After explanation of the crimes charged and the elements of those offenses, Walton acknowledged that he understood the elements of the crimes charged and the maximum sentences to which he was exposed as a result of pleading guilty.[80] Walton affirmatively answered that he understood that the Court could impose a maximum sentence and that any

---

[74] R. Doc. Nos. 104, 404.

[75] R. Doc. No. 405, p.7.

[76] *Id.* at 4-5, 8.

[77] *Id.* at 38.

[78] *Id.* at 9-18.

[79] *Id.* at 18-19.

[80] *Id.*

estimate of his sentence made by counsel pursuant to the sentencing guidelines could only be understood to be a rough estimate as this Court was not bound by such an estimate.[81]

This Court then advised Walton of his constitutional right to a trial by jury and the other constitutional rights waived by the entry of a plea.[82] Walton stated to this Court that he understood that he was waiving his right to trial by jury, that the Government would not be required to prove him guilty, and that he understood that if the Court accepted his guilty plea there would be no further trial, and the Court would simply enter a judgment of guilty and sentence him on the basis of his guilty plea.[83]  The Court repeatedly asked Walton if he had a full

---

[81] THE COURT:  Do you fully understand, if I accept your plea of guilty, I can impose the maximum possible sentence I just related to you?

THE DEFENDANT:  I do, sir.

THE COURT:  Do you understand I could impose a life sentence on you in connection with you pleading guilty?  Do you understand that?  Speak up.  Do you understand that?

WALTON:  I do, sir, yes, sir.

*Id.* at 19-20, 31.

[82] *Id.* at 21-22.

[83] THE COURT: Now, do you understand, if I accept your guilty  plea, you will not be entitled to a trial and the Government would  not be required to prove you guilty?  Do you understand that?

WALTON:  I do, sir, yes, sir.

THE COURT:  Do you understand, if you plead guilty and I accept your guilty plea, you'd be waiving, giving up your right to trial and all the other rights I just explained to you?

WALTON:  I do, sir.

THE COURT:  Do you fully understand, if I accept your guilty plea, there will be no trial and I will simply enter a judgment of guilty and sentence you on the basis of your guilty plea?

WALTON:  I do, sir.

THE COURT:  Are you willing to give up your right to trial by jury or judge?

WALTON:  I do, sir, yes, sir.

*Id.* at 22.

understanding of the rights he was giving up and whether he was entirely satisfied with the advice and services of his attorney.[84] The Court also carefully questioned Walton's counsel as to whether or not she was satisfied that he was pleading guilty voluntarily with a full understanding of the consequences of his plea.[85] This Court then asked the defendant directly, "Are you pleading guilty voluntarily and of your own free will?" The defendant answered, "Yes, sir."[86]

Although Walton now argues that the psychological evaluation conducted by Dr. Bauer shows that his impairments prevented him from being able to understand and process the

---

[84] *See generally id.*

[85] THE COURT:  Have you had full opportunity to investigate the facts under the law applicable to the case, as well as any possible defenses he may have, and to advise and counsel with him?

MS. COLINCHAK:  Yes, I have, Your Honor.

THE COURT:  Counsel, do agree with him in his decision to plea guilty?

MS. COLINCHAK:  I do, Your Honor.

THE COURT:  Are you satisfied he's pleading guilty voluntary and understanding and with full knowledge of the consequences of his plea?

MS. COLINCHAK:  Yes, I do, Your Honor.

THE COURT:  Have you made any representations to him as to the sentence I will impose?

MS. COLINCHAK:  I have not, Your Honor.

THE COURT:  Have you explained to him that I can impose a life sentence in connection with one of those counts?

MS. COLINCHAK:  Yes, I have, Your Honor.

THE COURT:  Sir, have you heard and understand the questions I just directed to your attorney, and her answers to the questions?

WALTON:  Yes, sir, Your Honor.

THE COURT:  Do you have any questions or comments to make with respect to any of the questions or your attorney's answers or other statements made by her?

WALTON:  No, sir.

*Id.* at 32-33.

[86] *Id.* at 38.

consequences of pleading guilty with a non-binding recommendation, the Court does not find that Dr. Bauer's report supports that conclusion.

Dr. Bauer conducted a comprehensive review of Walton's background including his academic and work histories as well as his medical, psychiatric, legal, psychological, family, and relationship histories.[87] Dr. Bauer interviewed Walton for one hour and forty-five minutes and she administered six psychological tests when evaluating Walton's intellectual and emotional capacities.[88] She interviewed Walton's mother, Charlene Reed Winham, who was accompanied by her sister, for one hour and fifteen minutes relevant to Walton's childhood and upbringing.[89] Dr. Bauer also interviewed Lt. Deborah Johnson for twenty minutes relevant to Walton's behavior in prison.[90] Dr. Bauer reviewed a number of records including several competency evaluations, special education records from Orleans Parish Public School System, and certain legal documents made in connection with this matter.[91]

Dr. Bauer concluded that Walton has a history of risk factors that contribute to delinquency including mental health problems, limited intellectual functioning, academic failure, speech delays, substance abuse, and lack of adequate parental support.[92] Walton's IQ fell in the low-average range with weaker performance in the verbal areas.[93] Dr. Bauer concluded that

---

[87] R. Doc. No. 397-4, pp. 3-5.

[88] *Id.* at 1.

[89] *Id.*

[90] *Id.*

[91] *Id.* at 1-2.

[92] *Id.* at 13.

[93] *Id.*

Walton performs academically in the 4th-6th grade range and that he continues to have difficulty communicating with others.[94] Dr. Bauer stated that Walton

> still struggles with communication. He continues to lack future goals, is still intimidated by authority figures and is easily frustrated and overwhelmed by his emotions. He has a tendency to react impulsively or shut down when provoked.[95]

According to Dr. Bauer, her findings were consistent with previous evaluations of Walton's competency and mental health throughout the years.[96]

Although the above findings suggest, as Dr. Bauer recommends, that Walton would benefit from opportunities to acquire additional educational training, tutoring, and vocational training,[97] Dr. Bauer's report in no way "firmly establishes" that Walton's impairments prevented him from adequately communicating with his counsel and the Court. In asserting his argument, Walton relies primarily on Dr. Bauer's suggestion that

> [w]hile Jamal understood what it meant to testify, and has the capacity to testify, he would have difficulty in speaking under duress. Likewise, while he could withstand the stress of trial and would not likely decompensate mentally under the stress of trial, he could have difficulty in managing his affect to make the most effective choices with his counsel.[98]

However, Dr. Bauer did not conclude that Walton was unable to effectively communicate with his counsel or to understand the nature of these proceedings. Dr. Bauer provided a detailed

---

[94] *Id.* at 13-14.

[95] *Id.* at 14.

[96] *Id.* at 13.

[97] *Id.* at 14.

[98] *Id.* at 12.

analysis with respect to Walton's (1) capacity to understand the proceedings against him, and (2) his capacity to assist counsel in his defense. Dr. Bauer specifically concluded that Walton:

> (1) Has a general awareness of his charges and had an appreciation of the seriousness of the offense.
>
> (2) Has the ability to understand the roles of defense counselor, prosecutor, Judge and witness,
>
> (3) Has the ability to distinguish between the pleas of guilty and not guilty,
>
> (4) Has the ability to protect himself and utilize the legal rights available to him,
>
> (5) Has the ability to understand and utilize available defenses,
>
> (6) Has the ability to recall and relate facts pertaining to his actions and whereabouts at certain times,
>
> (7) Could recall where he was when he was arrested and with whom he spoke,
>
> (8) Has the ability to assist counsel in locating and examining witnesses,
>
> (9) Has the ability to maintain a consistent defense and inform his attorney of misstatements of others,
>
> (10) Has the ability to testify relevantly,
>
> (11) Understood that he was not obligated to testify,
>
> (12) Has the capacity to make decisions in response to well explained alternatives,
>
> (13) Could describe a plea bargain and used rational decision making process when discussing whether to take a plea bargain or not in hypothetical situations,
>
> (14) Has the ability to refrain from irrational and unmanageable behavior at trial and has the ability to tolerate the stress of a trial.[99]

---

[99] *Id.* at 11-12

Dr. Bauer's oral testimony to the Court confirmed the statements set forth in her expert report

and that she was of the opinion that Walton was able to understand the proceedings against him

and to assist his counsel in preparing his defense.

Walton's adequate ability to understand these proceedings is further reflected in three

recorded telephone conversations between Walton and an unknown female that took place before

and after he had decided to enter his guilty plea. In the first[100] and second[101] conversations,

---

[100] The first recorded telephone conversation contained the following exchange:

UNKNOWN FEMALE: Why you goin' to trial?

WALTON: Ahhh . . . cause you know them people tryin' to man . . . them people tryin' to come at a nigga with 30 years to life, man. Them people want me . . . . . . (inaudible) . . . take that. I'm goin' to trial man. Them people gonna have to give me life, ya heard me? . . . (inaudible) . . . people trippin' . . .

UNKNOWN FEMALE: Why would you take life over 30 years?

WALTON: Man . . . whay ya mean why? Man . . .

UNKNOWN FEMALE: Why would take life rather than takin' 30?

WALTON: That's the same thing. That's the same thing, fuck.

UNKNOWN FEMALE: No, at least you'll get out . . .

WALTON: Man.

UNKNOWN FEMALE: On 30 . . .

WALTON: Fuck that. Fa real, man . . . I'm goin' to trial and hope I win, fuck.

UNKNOWN FEMALE: Boy, you better go take a plea.

WALTON: Huh?

UNKNOWN FEMALE: You better go sit at that round table. That what you better do.

WALTON: Man . . . there's no way. Ya heard me, them people . . . . . . (inaudible) . . . fa real man them people told a nigga do 30 years to life.

R. Doc. No. 421-1, pp. 2-3. Walton did not provide an alternative transcript and he does not contest the government's transcript.

[101] The second recorded telephone conversation contained the following exchange:

UNKNOWN FEMALE: Don't take it to trial. Ya take it to trial . . .

which occurred before he entered his guilty plea, Walton acknowledges his understanding that if he accepted the government's plea offer, he would be exposed to a possible sentence of thirty years to life imprisonment. Walton also demonstrated an understanding that if he received a thirty-year sentence, he would likely serve at least twenty-seven years of that sentence.[102] In the third conversation, which occurred after he entered his guilty plea, Walton can be heard

---

WALTON: Shit . . . .

UNKNOWN FEMALE: That's when ya may get . . . and don't go up in there with no attitude and all that.

WALTON: Man, what you mean man? I'm goin' to trial, man. You trippin' . . . came back where them people tryin' to make me take about 30 years . . .

UNKNOWN FEMALE: Why you . . . why you goin' to trial?

WALTON: Huh?

UNKNOWN FEMALE: Why is you tryin' to take it to trial?

WALTON: Man, cause, man . . . . . . (Inaudible) . . .

UNKNOWN FEMALE: That's that's when they stick it to you.

WALTON: Man, . . . (inaudible) . . .

UNKNOWN FEMALE: Yeah.

WALTON: I'm not about to take no 30 years for them people, man. Them people, man . . . Fuck them people, man. Man, them people gonna have to give me everything.

UNKNOWN FEMALE: See, see what they offerin' first. See what them people gonna offer you first before you just jump the gun.

WALTON: I'm tellin' you. You trippin', man. . . . (Inaudible) . . .

UNKNOWN FEMALE: Tryin' to go to court on the 15th?

WALTON: Yeah, man, them people talkin' about 30 years to life, ya heard me? Man, you think I'm about to plea out to that?

UNKNOWN FEMALE: You ain't gonna do all of it.

WALTON: Shit . . . you gonna do like about 27 of 30.

R. Doc. No. 421-2, pp. 2-3. Walton did not provide an alternative transcript and he does not contest the government's transcript.

[102] *See id.*

23

explaining to an unknown female that he had been "trying to play crazy" but that "them people ain't going for that crazy shit."[103] Walton explained that "[t]he judge dogged me like I was high as a son-of-a-gun . . . ."[104] Presumably, Walton was referring to the fact that this Court stated that he sounded "like he was on something" during the rearraignment.[105] These telephone exchanges demonstrate that Walton possessed a clear understanding of the course of the proceedings and the consequences on his legal situation.[106]

Walton's argument that his counsel lacked the ability to effectively communicate the complexities of an alleged non-binding sentencing recommendation without the assistance of Dr. Bauer is further undermined by the lack of any evidence that the government ever offered to make such a sentencing recommendation. First, Walton's plea agreement contains no representations by the government that it would agree to make a sentencing recommendation.[107] Second, this Court questioned Walton and his counsel during the rearraignment as to whether any predictions or promises had been made by the government with respect to his sentence.[108] Walton and his counsel denied that anyone had made any predictions or promises as to what his sentence would be when he entered his plea of guilty.[109] Finally, Walton has not argued, much

---

[103] R. Doc. No. 407, pp. 19-20; R. Doc. No. 420-1, pp. 2-3.

[104] R. Doc. No. 407, pp. 19-20; R. Doc. No. 420-1, pp. 2-3. Walton provided an alternative transcription of the third phone call offered by the government. The differences are not substantive and do not affect the Court's decision.

[105] *See* R. Doc. No. 405, pp. 4.

[106] The Court observes that when Dr. Thompson completed his competency evaluation of Walton on July 23, 2010, he noted that Walton was overheard talking to another inmate and "appeared to be functioning at a much higher level than during the evaluation."

[107] *See* R. Doc. No. 335.

[108] R. Doc. No. 405, pp. 31-33.

[109] THE COURT: Do you understand what the US attorney read, and is that your understanding of the Plea Agreement in this case.

less presented any evidence, that the government is in breach of an oral commitment not reflected in the plea agreement as a result of its refusal to give a non-binding sentencing recommendation.[110] As stated, however, Walton has also not shown that his counsel was unable to effectively communicate the complexities of a non-binding recommendation, even if the government had made such a promise.

In summary, Walton's argument that he lacked the advice of competent counsel without the assistance of Dr. Bauer fails to establish that his plea was not knowing, intelligent, and voluntary. Given Walton's affirmations to this Court, which were made under oath during the rearraignment proceedings, and the overwhelming evidence that Walton was sufficiently capable

---

THE DEFENDANT: I do, sir.

THE COURT: Do you understand that any discussion with your attorney or anyone else regarding Sentencing Guidelines are merely a rough estimate, and I am not – the Court is not bound by those discussions; do you understand that?

THE DEFENDANT: I do, sir.

THE COURT: Has anyone connected with the Government, anyone connected with law enforcement or anyone else at any time, other than rough estimates of sentencing guidelines, made any prediction or promise to you as to what your sentence will be?

THE DEFENDANT: No, sir.

. . .

THE COURT: (to counsel) Have you made any representations to him as to the sentence I will impose?

MS. COLINCHAK: I have not, Your Honor.

THE COURT: Have you explained to him that I can impose a life sentence in connection with one of those counts?

MS. COLINCHAK: Yes, I have, Your Honor.

*Id.*

[110] Other than unsubstantiated assertions in his memorandum, and considering the fact that he provided no evidence at the evidentiary hearing supporting such an allegation, Walton has not provided this Court with any evidence that a non-binding recommendation was made by the government. The Court further notes that it would never have sentenced Walton to a 25 year term of imprisonment as that sentence would not reflect the severity of his offense.

of understanding the proceedings and assisting counsel, the Court finds that Walton's belated assertion that his plea was not knowing, intelligent, and voluntary lacks credibility.

## IV. Close Assistance of Counsel

The record in this case clearly discredits Walton's argument that he was denied close assistance of counsel. "Determining whether a defendant received close assistance of counsel requires a fact-intensive inquiry." *United States v. McKnight*, 570 F.3d 641,646 (5th Cir. 2009). The Fifth Circuit has made clear that determining whether a defendant received close assistance of counsel under Federal Rule of Criminal Procedure 11(d)(2)(B) is distinct from determining constitutionally ineffective assistance of counsel under the Sixth Amendment. *Id.*

Kolinchak has stated that she thoroughly familiarized herself with Walton's case file and background.[111] She attested to the Court during Walton's rearraignment that she had a full opportunity to investigate the facts under the applicable law to the case as well as any possible defenses Walton may have had.[112] She also attested that she had a full opportunity to advise and counsel with him.[113]

Kolinchak negotiated with the government for a plea bargain on at least two occasions[114] and, at the rearraignment, Kolinchak represented to the Court that "I spoke to [Walton] this morning. I spoke to him yesterday. I spoke to him the day before yesterday. My colleague saw him earlier this week. I saw him last week. And then, prior to that, it was two weeks. So

---

[111] R. Doc. No. 397-1, p.3.

[112] R. Doc. No. 405, p.32.

[113] *Id.*

[114] R. Doc. No. 397-1, pp. 3-4.

several times."[115] Kolinchak independently arranged to have a psychological evaluation conducted on Walton by Dr. Bauer for the purposes of sentencing and she filed several objections to the Presentence Report on behalf of Walton. Finally, nothing in Dr. Bauer's report and/or testimony demonstrates that Walton was unable to effectively communicate with his counsel or understand the proceedings such that he was denied the close assistance of counsel. Accordingly, the Court finds that Walton received close assistance of counsel throughout the course of the proceeding. *See McKnight*, 570 F.3d at 646-47.

## V. The Remaining Factors

The remaining factors for the Court to consider are (1) whether withdrawal would cause the government to suffer prejudice, (2) whether withdrawal would substantially inconvenience the court; and (3) whether withdrawal would waste judicial resources. With respect to the prejudice prong, the government contends that allowing Walton to withdraw his guilty plea at this time would force the government to reprise a trial it believed had been waived six months ago.[116] The government would have to locate and elicit testimony from witnesses that were reluctant to testify and face security issues due to their cooperation with the government.[117] Walton would also be permitted to go to trial without the presence of his co-defendant, Charles Raymond, but having obtained the strategic benefit of knowing the government's case.[118]

The Fifth Circuit has made clear that "the absence of a showing of prejudice by the government is not sufficient to require withdrawal of the plea where 'no credible reason is

---

[115] R. Doc. No. 405, p.8.

[116] R. Doc. No. 407, pp. 5-6.

[117] *Id.*

[118] *Id.*

proffered.' " *United States v. Benavides*, 793 F.2d 612, 617 (5th Cir. 1986) (quoting *United States v. Rasmussen*, 642 F.2d 165, 168 n.6 (5th Cir. 1981)).  In other words, "there is no occasion to inquire into the matter of prejudice unless the defendant first shows a good reason for being allowed to withdraw his plea . . . ." *Id.* (quoting the Advisory Committee note to former Fed. R. Crim. P. 32(d)).  The United States Supreme Court has noted:

> Given the great care with which pleas are taken under [the] revised Rule 11, there is no reason to view pleas so taken as merely 'tentative,' subject to withdrawal before sentence whenever the government cannot establish prejudice.  Were withdrawal automatic in every case where the defendant decided to alter his tactics and present his theory of the case to the jury, the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim. In fact, however, a guilty plea is no such trifle, but a grave and solemn act, which is accepted only with care and discernment.

*Hyde*, 520 U.S. at 676-677, 117 S. Ct. at 1634 (internal quotations and citations omitted).

Although Walton has not shown a good reason for being allowed to withdraw his plea, the Court nevertheless finds that the remaining factors weigh against allowing him to withdraw his plea.  The government has sufficiently demonstrated that it would be prejudiced by the untimely withdrawal of Walton's guilty plea.[119]  Allowing Walton to withdraw his plea at this time would also substantially inconvenience this Court and waste judicial resources as it would require an additional trial when Walton could have been tried together with Raymond more than five months ago.  Considering the totality of the circumstances, the Court finds that Walton has not shown a fair and just reason to withdraw his guilty plea.

### CONCLUSION

For the foregoing reasons,

---

[119] Although the government had previously moved to sever the trials of Raymond and Walton, the Court notes that the motion was based on the need to avoid violating the principles set forth in *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). *See* R. Doc. No. 322.

**IT IS ORDERED** that the motion, filed on behalf of defendant, Jamal Walton, to withdraw his guilty plea is **DENIED**.


New Orleans, Louisiana, March 30, 2012.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**